Present:  All the Justices

S. VANCE WILKINS, SPEAKER OF THE
HOUSE OF DELEGATES, ET AL.

v.  Record No. 021003     OPINION BY JUSTICE ELIZABETH B. LACY
                                      November 1, 2002
DOUGLAS MACARTHUR WEST, ET AL.

              FROM THE CIRCUIT COURT OF THE CITY OF SALEM
                    Richard C. Pattisall, Judge

     Article II, § 6 of the Constitution of Virginia provides:

          Members of the House of Representatives of the
     United States and members of the Senate and of the
     House of Delegates of the General Assembly shall be
     elected from electoral districts established by the
     General Assembly.  Every electoral district shall
     be composed of contiguous and compact territory and
     shall be so constituted as to give, as nearly as is
     practicable, representation in proportion to the
     population of the district.  The General Assembly
     shall reapportion the Commonwealth into electoral
     districts in accordance with this section in the
     year 1971 and every ten years thereafter.

The official 2000 United States census data showed that

Virginia's population had grown 14.4% over the previous decade,

from 6,187,350 residents in 1990, to 7,078,515 in 2000.  The

data also showed that the population growth in Northern

Virginia and suburban areas of the state was greater than in

other areas of the state.  Some of the central cities and rural

areas of the Commonwealth had experienced a decrease in

population.  To comply with Article II, § 6 the Virginia

General Assembly was required to enact new electoral districts

in 2001.

After receiving the 2000 census data, the General Assembly enacted Senate Bill 1 (SB 1) and House Bill 1 (HB 1) creating new electoral districts for the Virginia General Assembly.  The bills were signed by the Governor on April 21, 2001 and subsequently submitted to the Attorney General of the United States for pre-clearance as required by the Voting Rights Act, 42 U.S.C. §§ 1971 through 1974(e) (2000), (VRA).  On June 15, 2001 and July 9, 2001, respectively, HB 1 and SB 1 received pre-clearance from the Attorney General.

This litigation was initiated by a Bill of Complaint filed on June 26, 2001 by 46 complainants against the Governor, Lieutenant Governor, Acting Attorney General, Secretary of the State Board of Elections, and six members of the General Assembly.[1]  An amended bill of complaint was filed on August 10, 2001.  Count I alleged that House of Delegates Districts 49, 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, and 95, and Senate Districts 2, 5, 9, 16, and 18, were "designed with the avowed, race-based goal of maximizing the number of minority voters" in violation of Article I, §§ 1 and 11 of the Constitution of Virginia.  Count II asserted that the pairing of incumbent female legislators in SB 1 and HB 1 intentionally

---

[1] The Lt. Governor was never served with process and the trial court granted the defendant legislators' motion to quash service of process on them.  The Acting Attorney General was dismissed as a defendant.

2

"disproportionately increase[d] the odds against re-election of certain Democratic female legislators" in violation of Article I, §§ 1 and 11 of the Constitution of Virginia. Count III asserted that the legislative redistricting plans unconstitutionally discriminated against Virginia voters on the basis of political viewpoint by disproportionately pairing incumbent Democratic legislators. In Count IV, the complainants asserted that 17 House Districts and 9 Senate Districts were not comprised of "contiguous and compact territory" as mandated by Article II, § 6 of the Constitution of Virginia. Finally, in Count V, the complainants charged that the districts were unequal on the basis of population because the Commonwealth did not use statistically adjusted census figures in violation of Article I, §§ 1 and 11 of the Constitution of Virginia.

Prior to trial, the defendants filed various motions to dismiss and a motion for change of venue. The trial court granted the defendants' motion to dismiss Count V but denied the motions requesting dismissal on the basis of standing and for a change of venue. A three-day, ore tenus hearing was held in September 2001. Following presentation of the complainants' evidence, the trial court granted the defendants' motion to strike Counts II and III. The claims of racial gerrymandering and non-compact and non-contiguous election districts contained

3

in Counts I and IV were submitted to the trial court for determination.

The trial court filed its amended written opinion on March 13, 2002. Applying a definition of contiguous that required reasonable internal access, the trial court concluded that Senate Districts 1, 2, and 6, along with House Districts 74, 91, and 100, did not satisfy the contiguous and compactness requirements of Article II, § 6 of the Constitution of Virginia. The trial court made no finding regarding challenged Senate Districts 3 and 4 because no evidence was introduced relating to those districts. The court found that the remaining districts challenged in Count IV reasonably complied with the requirements of Article II, § 6 as interpreted by this Court in Jamerson v. Womack, 244 Va. 506, 423 S.E.2d 180 (1992).[2]

The trial court struck as unconstitutional House Districts 62, 69, 70, 71, 74, 77, 80, 89, 90, 91, 92, and 95, and Senate

_____

[2] A number of discrepancies exist regarding the challenged districts and the holdings of the trial court. In its amended opinion the trial court listed House District 75 as a district challenged by complainants as not compact and contiguous, although District 75 was not listed in Count IV of the amended Bill of Complaint. The trial court found that District 75 did not violate Article II, § 6. Similarly the complainants challenged House District 79, but the trial court did not identify that district as a challenged district in Count IV and made no ruling on the district. Finally, the trial court held Senate District 6 in violation of Article II, § 6

4

Districts 2, 5, 9, 13, 16, and 18.[3]  The trial court held that

those districts violated Article I, §§ 1 and 11 because

> the General Assembly of Virginia has subordinated
> traditional redistricting principles to race in
> drawing district lines.  The Court having found that
> race was the predominate factor in drawing district
> lines has applied strict scrutiny to determine if
> race was necessary to further some compelling state
> interest and in all of the challenged districts,
> with the exception of those previously mentioned,
> the Commonwealth has failed to show that the
> electoral districts for the House of Delegates or
> Senate achieve any compelling state interest or
> action that it is narrowly tailored to fit such
> interest.

Based on these findings, the trial court enjoined the

defendants from conducting any elections under HB 1 or SB 1

until the General Assembly enacted, and the Governor signed,

legislation establishing "new redistricting statutes for the

House of Delegates and the Senate Districts that abide by all

of the requirements of the Constitution of the United States

and Constitution of Virginia, specifically adhering to Article

I, § 1, Article I, § 11, and Article II, § 6, and the other

laws of the Commonwealth . . . ."  The trial court also ordered

that "an election to elect representatives from each new

---

although the amended Bill of Complaint did not claim such a
violation.

[3] The trial court stated in its amended opinion that
Senate District 13 and House Districts 62, 64, 83, and 91 were
challenged as racially gerrymandered.  These districts were
not listed in the amended Bill of Complaint as violating
Article I, § 11.  The trial court struck District 91, upheld
District 64, and made no ruling on District 83 on this issue.

5

electoral district enacted for the House of Delegates be conducted in 2002, as provided by law, to take office as members of the House of Delegates upon convening of the 2003 session of the General Assembly of Virginia."  The trial court denied the defendants' motion for a stay pending appeal.

The defendants filed a notice of appeal, a petition for appeal, a motion for expedited appeal, a motion for a stay of the trial court's order pending appeal, and a petition for a writ of prohibition.  We granted the defendants' petition for appeal and motion for stay pending appeal.[4]

On appeal, the defendants raise eight assignments of error.  The first three assignments address the substantive findings of the trial court in this matter:  (1) whether the complainants lacked standing to pursue the litigation; (2) whether certain districts met the constitutional requirement of compactness and contiguity; and (3) whether certain districts were racially gerrymandered.  These issues, in our view, are dispositive of this appeal.

## I.  STANDING

The defendants argue that the trial court should have dismissed the bill of complaint because the complainants failed

---

[4] Governor Mark R. Warner was substituted for former Governor James Gilmore, III, by order entered April 12, 2002 pursuant to Rule 2:16.  Governor Warner withdrew as an

6

to establish that they had standing to pursue the claims asserted.  Relying on this Court's precedent, the defendants maintain that standing to challenge an electoral district should not be inferred solely from residency in that district. Rather, the defendants argue, standing requires "a personal stake in the outcome" of the litigation.  Cupp v. Board of Supervisors, 227 Va. 580, 589, 318 S.E.2d 407, 411 (1984) (emphasis deleted).  Merely advancing a public right or redressing a public injury cannot confer standing on a complainant.  Virginia Beach Beautification Comm'n v. Board of Zoning Appeals, 231 Va. 415, 419, 344 S.E.2d 899, 902 (1986). Thus, the defendants assert that to establish standing, the complainants were required to show that they suffered racial, gender, or political discrimination, and, if the injury was racial in nature, the complainant had the burden of establishing his or her race.

Because proof of residency was the only evidence produced by the complainants relative to standing, the defendants argue that the trial court erred in not granting their motion to dismiss the amended bill of complaint for lack of standing. The defendants further assert that the trial court erred in failing to dismiss the complainants' challenges to four House

appellant and participated in the appeal of this case as an amicus curiae on behalf of the complainant-appellees.

districts and three Senate districts because none of the complainants resided in those districts.

The complainants contend that proof of residency in a particular district is sufficient to establish standing to challenge actions in other districts as well as the district of residence.

Standing to maintain a challenge to redistricting legislation is an issue of first impression in this Commonwealth. In our previous redistricting cases, we recited the status of the various complainants, but we did not address the elements required to establish standing to maintain such an action. Wilkins v. Davis, 205 Va. 803, 139 S.E.2d 849 (1965); Davis v. Dusch, 205 Va. 676, 139 S.E.2d 25 (1964); Brown v. Saunders, 159 Va. 28, 166 S.E. 105 (1932). The complainants here, while acknowledging that the issue of standing in this case is one of state jurisprudence, suggest that we adopt the standing principles enunciated by the Supreme Court in United States v. Hays, 515 U.S. 737 (1995), for cases involving challenges to redistricting legislation.

The plaintiffs in Hays challenged Louisiana's congressional redistricting statute, asserting it was racially gerrymandered in violation of the Fourteenth Amendment to the United States Constitution. The challenge was directed at District 4 of the plan but the plaintiffs were residents of

8

District 5.  The Supreme Court concluded that the plaintiffs did not have standing to maintain the challenge because standing requires the plaintiff to show that he or she has suffered an " 'injury in fact' – an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Hays, 515 U.S. at 743 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  And, in an equal protection claim, only "'those persons who are personally denied equal treatment' by the challenged discriminatory conduct," suffer such injury. Hays, 515 at 743-44 (citations omitted).  Thus, the Supreme Court rejected the proposition that any citizen of a state would have standing to challenge a redistricting statute on an equal protection claim regardless of whether such citizen was personally denied equal treatment.

Recognizing that demonstration of a particularized injury in the racial gerrymandering context may be difficult, the Supreme Court concluded that an inference of particularized injury was created for a plaintiff who resides in a racially gerrymandered district because such resident "has been denied equal treatment because of the legislature's reliance on racial criteria . . . ."  Id. at 745.  This inference vests the resident of the district with standing in federal court to challenge the use of racial classification in creating that

9

district.  A person who does not live in such a district does not suffer such harm and is not entitled to the inference of harm, but may establish standing nevertheless, if he or she produces specific evidence to show individualized injury resulting from racial classifications.  "Unless such evidence is present, that plaintiff would be asserting only a generalized grievance against governmental conduct of which he or she does not approve."  Id.

Like federal standing jurisprudence, our requirement that a complainant show a particularized injury applies to claims of racial gerrymandering under Article I, §§ 1 and 11 of the Constitution of Virginia.  While specific evidence of personal harm in the redistricting context may be difficult to show, we agree that residents of a racially gerrymandered electoral district "suffer the special representational harms racial classifications can cause in the voting context."  Id. Accordingly, we, like the federal courts, will consider proof of residency in an alleged racially gerrymandered district as sufficient to establish standing to challenge that district without further proof of personalized injury.  Standing can also be shown by a non-resident of the district who produces specific evidence of a particularized injury arising from the alleged racial gerrymandering.

10

While this standard was developed in the context of racial gerrymandering claims, we believe the same standard is appropriate to establish standing for allegations that electoral districts violate the compactness and contiguous requirements of Article II, § 6 of the Constitution of Virginia.  If a district fails to meet the compactness and contiguous requirements, residents of that district are directly affected by the legislature's failure to comply with the Constitution of Virginia.  In the absence of residency in a challenged district, a complainant can establish standing only by showing a particularized injury.

The complainants claim that any citizen of the Commonwealth has standing to challenge any district based on violations of Article I, §§ 1 and 11 or Article II, § 6 because an unconstitutional configuration of one district may have an impact on the drawing of all other districts.  We reject this rationale as a basis for establishing standing.  It is true that if a district must be reconfigured, another district or districts will be affected; however, this fact does not give rise to any inference that every district will be affected, or that such effect will have a constitutional impact on every citizen.  Furthermore, any attempt to identify in this forum which district or districts will be affected by legislative action in reconfiguring the districts is entirely speculative.

The fact that a putative complainant's district may be affected is insufficient to establish the particularized injury required for standing in a redistricting case.

Applying these principles to the record in this case, we conclude that the trial court erred in denying the defendants' motion to dismiss those claims challenging electoral districts in which no complainant resides and no evidence of injury to non-resident complainants was produced. Specifically, the trial court had no jurisdiction to consider claims against Senate Districts 1, 6, and 13, and House Districts 62, 83, 91, and 100. Accordingly, we will vacate the judgment of the trial court with regard to those districts and will not consider them further.[5]

## II. COMPACT AND CONTIGUOUS DISTRICTS

Article II, § 6 of the Constitution of Virginia requires that electoral districts adopted by the General Assembly be "composed of contiguous and compact territory." The trial court held that the contiguity requirement included a reasonable opportunity for travel within the district. The trial court also determined that it was not bound by the expert's testimony regarding compactness, and it concluded that it was the court's responsibility to "examine each district in

context of its geographical form and structure in relation to other portions of the district . . . ." Of the districts which complainants had standing to challenge, Senate District 2 and House District 74 were found by the trial court to violate the requirements of Article II, § 6 with regard to compactness and contiguity.

## A. Standard of Review

The defendants argue that the trial court erred because it did not review the legislative action using the "fairly debatable standard" utilized in Jamerson v. Womack, 244 Va. 506, 423 S.E.2d 180 (1992), and because it construed contiguity by water to include convenience of travel within the district. The complainants respond that the trial court correctly found that contiguity required a reasonable opportunity for access within the district, and under the standards developed in Jamerson, the trial court correctly held that the districts in question were plainly repugnant to the Constitution.

In Jamerson, the complainants asserted that two electoral districts in the 1991 Senate redistricting plan did not comply with the compactness requirement of Article II, § 6. In resolving the issue, we recited the principles applicable to our review of legislative determinations. First, legislation

_____

[5] In light of this holding we do not address whether the trial court properly considered Senate District 6 in the

13

is entitled to a "strong presumption of validity" and will be invalidated by the courts only if it clearly violates a constitutional provision.  Id. at 510, 423 S.E.2d at 182. "[O]nly where the statute in issue is 'plainly repugnant' to a constitutional provision will we declare it null and void." Id.(citations omitted).

When the constitutionality of a statute depends on facts, the determination of those facts by the legislature can be set aside if it is clearly erroneous, arbitrary, or wholly unwarranted.  If the evidence offered in support of the facts in issue would lead objective and reasonable persons to reach different conclusions, the legislative determination is considered fairly debatable and such a determination must be upheld by the courts.  Id. at 509-10, 423 S.E.2d at 182. Although Jamerson involved a challenge to the constitutional requirement of compactness only, these principles are equally applicable to the current challenge to the requirement of contiguity.

We also note, as we did in Jamerson, that Article II, § 6 speaks in mandatory terms, stating that electoral districts "shall be" compact and contiguous.  This directive, however, does not override all other elements pertinent to designing electoral districts.  In making reapportionment decisions, the

absence of a challenge to that district by the complainants.

14

General Assembly is required to satisfy a number of state and federal constitutional and statutory provisions in addition to designing districts that are compact and contiguous. To do this requires the General Assembly to exercise its discretion in reconciling these often competing criteria. Id. at 511, 423 S.E.2d at 182-83.

Finally, any purpose that may underlie the design of an electoral district, while relevant to challenges under other portions of the Constitution of Virginia as discussed below, is not determinative in a challenge based on Article II, § 6. Determinations of contiguity and compactness, as we said in Jamerson, are limited to consideration of the district from a spatial perspective, id. at 514, 423 S.E.2d at 184, taking into consideration the other factors which a legislative body must balance in designing a district.

In summary, if the validity of the legislature's reconciliation of various criteria is fairly debatable and not clearly erroneous, arbitrary, or wholly unwarranted, neither the court below nor this Court can conclude that the resulting electoral district fails to comply with the compactness and contiguous requirements of Article II, § 6. We now apply these principles to Senate District 2 and House District 74.

B. Senate District 2

15

Senate District 2 is comprised of part of the City of Hampton, part of the City of Newport News, one precinct of the City of Suffolk, and one precinct of the City of Portsmouth. The Portsmouth-Suffolk portion of the district is separated from the Hampton-Newport News portion by the Hampton Roads body of water. Travel by motor vehicle between the two portions of the district is possible by driving four to five miles on the Hampton Roads Beltway, Interstate Highway I-664.

The trial court first determined that, to meet the constitutional requirement of contiguity, land masses within a district that are separated by water must provide for every part of the district to be accessible "to all other parts of the district without having to travel into a second district."

We have not previously considered the elements which may be required to meet the state constitutional mandate of contiguity. Clearly, a district that contained two sections completely severed by another land mass would not meet this constitutional requirement. Moreover, no one disputes that the geography and population of this Commonwealth necessitate that some electoral districts include water, and that land masses separated by water may nevertheless satisfy the contiguity requirement in certain circumstances.

The trial court's requirement that there be a bridge, road, or ferry allowing full internal access to all parts of

16

the district is a requirement grounded in the theory that residents of the district need to have physical access to other parts of the district.  However, such physical access is not necessary for exercising the right to vote, does not impact otherwise intact communities of interest, and, in today's world of mass media and technology, is not necessary for communication among the residents of the district or between such residents and their elected representative.

As indicated above, the General Assembly must balance a number of competing constitutional and statutory factors when designing electoral districts.  In addition, traditional redistricting elements not contained in the statute, such as preservation of existing districts, incumbency, voting behavior, and communities of interest, are also legitimate legislative considerations.  Id. at 512-14, 423 S.E.2d at 183-84.  While ease of travel within a district is a factor to consider when resolving issues of compactness and contiguity, resting the constitutional test of contiguity solely on physical access within the district imposes an artificial requirement which reflects neither the actual need of the residents of the district nor the panoply of factors which must be considered by the General Assembly in the design of a district.  Short of an intervening land mass totally severing two sections of an electoral district, there is no per se test

17

for the constitutional requirement of contiguity. Each district must be examined separately.

In this case, the trial court found that Senate District 2 failed the constitutional requirement of contiguity, not because there was no access between the two portions of the district, but because the access was unreasonable. The trial court cites no record evidence supporting its position that the travel required was unreasonable and our review of the record shows none.

Similarly, the trial court held that the four or five mile separation across water rendered the district non-compact without any further explanation or discussion of evidence supporting this conclusion. The trial court did note, however, that "there was no testimony that any particular district was unacceptably non-compact according to either of the measures applied by the experts."[6]

In our view, the evidence in this record does not rise to a level of proof implicating application of the fairly debatable standard. And it is wholly insufficient to support

---

[6] Complainants' expert Dr. Lublin, and defendants' expert Dr. Webster, both utilized the Reoch/Geographic Dispersion Method and the Polsby-Popper/Perimeter Compactness Method as objective measures of compactness. The former measures the level of compactness by determining the ratio of the area of the district to the smallest circle that can be superimposed over the district. The latter computes a ratio based on the

a conclusion that Senate District 2 clearly violates or is plainly repugnant to the compactness and contiguity requirements of Article II, § 6. Accordingly, we will reverse the trial court's judgment in that regard.

## C. House District 74

The trial court also concluded that House District 74 violated the compactness requirement of Article II, § 6 of the Constitution of Virginia because a 20-mile long stretch of land connected the northern portion of the district in Henrico County to the City of Hopewell, the southern portion of the district. Using its definition of constitutional contiguity, the trial court also found that District 74 violated Article II, § 6 because the City of Hopewell precincts were separated from the remainder of the district by the James River. No tunnel, road, or bridge connects this portion of the district with the remainder of the district and travel through other districts is required to access the remainder of District 74 from the Hopewell precincts.

In Jamerson, we considered two electoral districts each covering significantly greater area than House District 74. We held that the manner in which the General Assembly reconciled the compactness requirement with the other factors

---

area of the district compared to a circle that equals the length of the perimeter of the district.

which had to be addressed in creating new electoral districts was not clearly erroneous, arbitrary, or wholly unwarranted. Even though reasonable persons may have configured the district differently in reconciling the various redistricting factors, applying the fairly debatable standard, we concluded that the choice of the General Assembly in reconciling these factors could not be set aside.  Id. at 517, 423 S.E.2d at 186.

The evidence in this case showed that House District 74 has the lowest rankings for compactness, but the expert testimony was that this district did not fall below an objective standard for compactness.  The new District 74 contained 98.3% of the 1991 district.  The change from the 1991 district was the reunification of a previously split precinct in Charles City County, the City of Hopewell precincts, and two precincts in Henrico County.

The record also shows that the incumbent member of the House of Delegates from House District 62 was a Republican. Removing the "highly Democratic" Hopewell precincts from District 62 made that district a "safer" Republican district.

The changes to House District 74 did not improve the district's rating with regard to compactness, but they did bring the district closer to the target population.  The black voting age population (BVAP) fell from 65% to 60%, but the

20

district continues to have more African Americans than any other district in HB 1.

Although the record shows that travel between the Hopewell precincts and the remainder of the district requires travel through another district, there is nothing in this record showing that such access is unreasonable, unduly burdensome, or adversely impacts the ability of residents to secure meaningful representation of their interests or effective communication with their elected representative. Furthermore, we think it is significant that this district's configuration has remained substantially the same for over a decade, allowing development of relationships and communities of interest relative to election of delegates. Maintaining an existing district in this case and removing the Hopewell precincts from the adjoining district in which the incumbent is Republican reflects the traditional redistricting considerations of incumbency.

This record reflects a balancing by the General Assembly of population equality, incumbency, maintaining communities of interest, and avoiding retrogression in designing District 74. While far from the most compact district, and containing a small portion that is contiguous only by water, nothing in this record indicates that the District is repugnant to the constitutional principles of compact and contiguous electoral

districts.  The expert testimony shows that the district is within acceptable objective measures of compactness.  No one has testified that communication between the residents of the district and their elected representative has been adversely impacted in the past in a substantially similar district, or will be adversely impacted in the future because of the design of the district.  No intervening land mass separates one portion of the district from another.

Given the strong presumption of constitutionality afforded legislative acts, and the fairly debatable standard we apply when considering the validity of such acts, we conclude that the trial court erred in holding that District 74 violated the compactness and contiguity requirements of Article II, § 6 of the Constitution of Virginia.

### III.  RACIAL GERRYMANDERING

The defendants also assign error to the trial court's holding that certain house and senate districts violated Article I, §§ 1 and 11 of the Constitution of Virginia because they were the product of racial gerrymandering.

### A.  Standard of Review

We have not previously considered a challenge of this nature solely under Article I, § 11 of the Constitution of Virginia.  Accordingly, we first address the standards for evaluating such a claim.

22

Article I, § 11 of the Constitution of Virginia provides in pertinent part that "the right to be free from any governmental discrimination upon the basis of . . . race . . . shall not be abridged."  In Archer v. Mayes, 213 Va. 633, 638, 194 S.E.2d 707, 711 (1973), we held that this provision was "no broader" than the equal protection clause of the Fourteenth Amendment to the United States Constitution and applied the federal rational basis standard of constitutionality in considering the challenge under the Virginia provision, even though the Virginia provision, unlike the federal equal protection clause, identified gender as a protected class.  In subsequent cases involving allegations that statutes violated both Article I, § 11 of the Constitution of Virginia and the equal protection clause of the federal constitution, we applied standards of constitutionality developed under federal law.  We neither stated nor applied a separate standard for resolution of the challenge under state law.  Hess v. Snyder Hunt Corp., 240 Va. 49, 53, 392 S.E.2d 817, 820 (1990) (statute not unconstitutional if meets rational basis test, or, if it affects fundamental right or suspect classification, meets strict scrutiny test); Mahan v. National Conservative Political Action Comm., 227 Va. 330, 336, 315 S.E.2d 829, 832 (1984).

The defendants argue that our jurisprudence requires that review of a legislative act requires application of the fairly debatable standard discussed above, and that this standard is simply another way of expressing the federal rational basis test. We need not resolve this semantics issue. Because the discrimination clause of Article I, § 11 is congruent with the federal equal protection clause, we will continue to apply the standards and nomenclature developed under the equal protection clause of the United States Constitution to claims involving claims of discrimination under Article I, § 11 of the state constitution, including the claims in this case.

In Hunt v. Cromartie, 532 U.S. 234 (2001), the most recent redistricting case involving a challenge of racial gerrymandering under the equal protection clause, the Supreme Court recited the burden borne by the challenger. A party asserting that a legislative redistricting plan has improperly used race as a criterion must show that the legislature subordinated traditional redistricting principles to racial considerations and that race was not merely a factor in the design of the district, but was the predominant factor. The challenger must show that a facially neutral law is explainable on no other grounds but race. Id. at 241-42. The Court in Cromartie went on to state

24

> where majority-minority districts . . . are at issue
> and where racial identification correlates highly
> with political affiliation, the party attacking the
> legislatively drawn boundaries must show at the
> least that the legislature could have achieved its
> legitimate political objectives in alternative ways
> that are comparably consistent with traditional
> districting principles.  That party must also show
> that those districting alternatives would have
> brought about significantly greater racial balance.

Id. at 258.

If the challenger meets its evidentiary burden, the electoral district in issue is subjected to strict scrutiny review, rather than a rational basis test, because the legislative action was taken on the basis of race, a suspect category.  Under the strict scrutiny standard, the defendant must show that the district's design was the result of a compelling governmental purpose and was narrowly tailored to achieve that purpose.  Miller v. Johnson, 515 U.S. 900, 920 (1995).

Additionally, the United States Supreme Court has repeatedly noted the discretion vested in a legislative body "to exercise the political judgment necessary to balance competing interests" in creating redistricting plans, and that "courts must 'exercise extraordinary caution' " in determining that an electoral district was motivated by racial, not political, interests when there is a high correlation in the voting age population between race and political affiliation.

25

<u>Cromartie</u>, 532 U.S. at 242 (quoting <u>Miller</u>, 515 U.S. at 915-16).

In this case, the defendants readily acknowledged that race was a consideration in drawing the district lines. The General Assembly was required to comply with the provisions of the VRA which mandate that a redistricting plan not dilute the African-American voter strength, 42 U.S.C. § 1973 (2000), and that there be no retrogression in the plan; that is, the plan must contain no fewer majority minority districts than the prior plan. 42 U.S.C. § 1973(c)(2000). The criteria adopted by the General Assembly specifically recognized these requirements as guiding factors in drawing the new redistricting legislation.[7]

Accordingly, to prevail in this case, the complainants were required to show that race was <u>the predominant factor</u> used by the General Assembly in drawing the districts at issue. Additionally, if the evidence showed a high correlation in the voting age population between race and political affiliation, the complainants were also required to

_____

[7] The House and Senate committees charged with drafting the redistricting plans adopted identical criteria: population equality with a deviation within plus or minus two percent, compliance with the Voting Rights Act, contiguous and compact districts, single-member districts, and respect for communities of interest. In the event of a conflict, priority was to be given to population equality and compliance with the

produce districting alternatives which were comparably consistent with traditional redistricting principles and which could have brought significantly greater balance while still achieving legitimate political objectives.

The trial court concluded that the complainants met this burden and, with regard to the districts in which the complainants had standing, declared that in creating Senate Districts 2, 5, 9, 16, and 18, and House Districts 69, 70, 71, 74, 77, 80, 89, 90, 92, and 95, the General Assembly "subordinated traditional redistricting principles to race," and that the defendants failed to show that these districts "achieve any compelling state interest or action that . . . is narrowly tailored to fit such interest."

In determining whether this conclusion was correct, we look to the underlying findings which formed the basis of such conclusion as to each of the districts. In doing so we note that, as in Cromartie, the trial was not long, the evidence consisted primarily of documents and expert testimony, and there were no issues involving the credibility of the witnesses. Cromartie, 532 U.S. at 243. Thus, the record before us for resolving this evidentiary question is in virtually the same posture as it was before the trial court.

state and federal constitutional requirements and the Voting Rights Act.

27

Based on our review of the record, we conclude that the complainants failed to carry their burden of proof that race was the predominant factor used by the General Assembly and that qualifying alternative plans were available.

## B.  Race as the Predominant Factor

Initially, we note that the complainants' factual premises supporting their contention that race was the predominate factor in drawing the districts are, in part, based on patterns gleaned from considering the redistricting plan as a whole.  These factual premises are, first, the use of split precincts in majority minority districts was disproportional, placing minorities in the majority minority district rather than in the majority white district, and, because only racial data is available below the precinct level, these precincts were split based on race, not politics.

Second, where majority African-American boundary precincts adjoined majority white precincts, the African-American precinct was consistently placed in the majority minority district rather than in the majority white district. This pattern again showed the use of race in designing the districts, according to the complainants.

And finally, the complainants cited instances where white Democratic precincts were placed in the white majority district while the adjoining African-American Democratic

28

precincts were placed in the majority minority district, thus, repeating a pattern of race-based behavior.

Patterns of behavior of the nature recited above may add support to the conclusion that race was a predominate factor in drawing district lines but are not themselves dispositive of the issue. The challenges in this litigation are to specific districts, each of which must be considered on its own merits, and, to prevail with regard to any specific district the complainants must satisfy their burden of proof as to that district.

We now turn to the trial court's determinations of racial gerrymandering assigned as error in this appeal.

1.  Senate Districts

a.  Senate District 2

Senate District 2 is a majority minority district comprised of parts of the Cities of Hampton and Newport News, and one majority African-American precinct each in Portsmouth and in Suffolk. The trial court found that to create this district the General Assembly crossed the Hampton Roads body of water, "grabbing" isolated minority precincts to make up for minority precincts it "shed" closer to the Newport News/Hampton core of the district. Crossing geographic and political boundaries in this manner was "in utter disregard of traditional redistricting principles," according to the trial

29

court.

The complainants' evidence included maps and charts, along with expert testimony, showing the district's configuration, population by race, BVAP, and political voting patterns in the 1997 gubernatorial race. The complainants' expert also addressed the Langely precinct in Hampton which was split between Senate Districts 1 and 2. The portion of the precinct placed in Senate District 2 had a 36.2% BVAP, while the portion assigned to the white majority district, Senate District 1, had a 20.4% BVAP, thus showing that the division was based on race, according to the complainants. Finally, the complainants' expert also stated that there were "several bordering precincts with relatively high concentrations of Democrats and low concentration of African-Americans that are excluded from the District." He concluded that placing the African-American Democratic precincts in the majority minority District 2 rather than the white Democratic precincts, further showed that race, not politics, was the predominant factor in drawing the district boundaries.

While much of this evidence is reflected in the trial court's conclusions, little, if any, of the defendants' evidence supporting other reasons for the design of Senate District 2 is noted. The defendants' evidence showed that Senate District 2 was under-populated by approximately 15% and

30

thus needed an additional 27,000 people to meet the district population requirement. The addition of the Suffolk and Portsmouth precincts added approximately 23,000 people. A net increase of approximately 1,000 more people resulted from the removal of 47,000 Newport News residents in the northern part of the district and the addition of approximately 48,000 residents of Hampton located immediately adjacent to the 1991 district.

The portion of Newport News removed from District 2 was connected by water, not land, to the remainder of the old district. The resulting change in the contours of District 2 increased its compactness under both the perimeter and geographic dispersion measurements when compared to the 1991 district. Finally, the racial profiles of the exchanged areas were similar.

The defendants' evidence also showed that the changes made the District more Democratic because the removed portion of Newport News had a higher percentage of Republican voters than the added portions of Hampton, Portsmouth, and Suffolk. Although the complainants asserted that adjacent white precincts with "high concentrations of Democrats" were intentionally left out of District 2, their exhibits showed that those precincts voted less than 50% Democratic in the 1997 gubernatorial race.

31

Finally, the complainants' expert, Dr. Allan J. Lichtman, testified that he did not independently look at compactness in analyzing the challenged districts, did not analyze the districts for contiguity or communities of interest, and did not consider incumbency interests as part of his analysis.

Based on this record we conclude that the complainants did not meet their evidentiary burden of showing that race was <u>the</u> predominant factor in drawing Senate District 2. Evidence of the enhanced compactness, contiguity, and population equality of the District, the increased size of the Democratic voter population of the District, and the failure of the complainants' expert to consider significant traditional redistricting principles adopted by the General Assembly as criteria for use in its redistricting process undermines the trial court's conclusion. Furthermore, the record shows that the section of the Newport News area "shed," according to the trial court, was not contiguous to the old district except by water and was not similar in racial makeup to the added Suffolk and Portsmouth precincts. The added portions of Hampton were, however, similar in BVAP to the Suffolk and Portsmouth precincts.

Finally, complainants' evidence that majority minority precincts were included in District 2 while bordering majority white precincts were retained in majority white districts does

32

not compel the conclusion that race was the predominant design factor when considered in conjunction with the evidence as a whole. Creating a majority minority district mandates placing minorities in that district and there is no dispute that race was a factor in drawing the district. Similarly, a single split precinct, one of only 15 split precincts in SB 1, with 1,375 African Americans unevenly divided between a white majority district and this majority minority district is insufficient to show that race was the predominant factor in designing the split of this precinct or the district itself.

Legislatures must balance competing redistricting criteria in creating electoral districts. This record contains substantial evidence that the General Assembly implemented a number of traditional principles of redistricting in creating Senate District 2 and, accordingly, does not support the conclusion that race predominated in the design of the district. Accordingly, we will reverse the trial court's judgment that Senate District 2 violated Article I, §§ 1 and 11.

b. Senate Districts 5, 9, 16, and 18

The trial court also held that the General Assembly subordinated traditional redistricting principles to race in creating Senate Districts 5, 9, 16, and 18. The sole basis cited for this conclusion was the trial court's finding that

33

the General Assembly placed more minority voters in a district than necessary to provide such voters with a reasonable opportunity to elect candidates of their choice, and, therefore, that the districts were not narrowly tailored in a manner reasonably necessary to comply with the federal requirements. However, the issue of narrow tailoring is part of the strict scrutiny test, a test not applicable until after a determination is first made that race was the predominant factor in drawing the district. Here, the trial court made no specific factual findings and cited no evidence relative to any of these districts in support of its conclusion that race was the predominant factor in designing each district.

The evidence produced by the complainants to meet their initial burden of proof regarding Senate District 5 involved Dr. Lichtman's testimony comparing border precincts and his conclusion the district was drawn based on race because African-American border precincts were placed within the majority minority district and white majority border precincts were not. The complainants' expert described the design of the district as having a "boot," looping lines, a "tail," and artificial peninsulas, all for the purpose of "picking off" or capturing African-American precincts and avoiding white precincts.

The defendants' evidence showed that Senate District 5

34

was under-populated by 33,320 people.  In adding population, over 97% of the district's core was retained, the district improved its compactness by the geographic dispersion method but decreased in perimeter compactness, and the BVAP decreased by approximately 4%.  Finally, with two exceptions, the areas added to the District reflected Democratic voting patterns in excess of 50%.

The evidence produced by the complainants on this issue for the remaining Senate districts, Senate Districts 9, 16, and 18, follows a similar pattern to that offered regarding Senate District 5.  As to each district, the complainants' expert described the design of these majority minority districts as dependent upon "grabbing" or "picking up" majority minority precincts while avoiding majority white precincts, resulting in such shapes as "sickles" and "peninsulas."  This expert also testified that in certain areas, white Democratic precincts were excluded from majority minority districts while adjacent majority minority precincts were included in such districts, leading to the conclusion that the districts were drawn on the basis of race, not politics.  However, the complainants' expert also testified that in his analysis he had not considered whether other traditional redistricting principles such as compactness and contiguity, communities of interest, or incumbency, were

35

reflected in the design of these districts.

The evidence produced by the defendants showed that these three Senate districts were all under-populated from a low of 9.9% to a high of 17%, requiring addition of population, that the redrawn districts were more compact by one or both of the objective tests used, and that the BVAP percentage declined with one exception where the BVAP rose from 56.5% to 58.5%. Finally, the defendants introduced maps and testimony regarding the political voting behavior in the challenged districts which showed a high correlation between race and voting patterns.

We conclude that this record does not support the trial court's holding that race was the predominant factor in designing Senate Districts 5, 9, 16, and 18 for many of the same reasons recited in our conclusion regarding Senate District 2. Unquestionably, the complainants have shown that race was a factor in designing these majority minority districts. Indeed, to comply with the non-retrogression requirements of Section 5 of the VRA, race had to be a factor in drawing these districts. The defendants have never maintained otherwise. The record shows however, that these districts also were drawn with attention to such factors as population equalization, compactness and contiguity, retention of core districts where possible, and enhancement of

36

communities of political interest.  We conclude that the complainants did not meet their "heavy burden" to show that the General Assembly, in exercising its political judgment to balance competing interests, was motivated by racial considerations, and subordinated other traditional redistricting principles to that end in creating Senate Districts 5, 9, 16, and 18.

## 2.  House Districts

### a.  House Districts 92 and 95

The City of Hampton is divided into three electoral districts:  House Districts 91, 92, and 95.  In District 92 and District 95, the Hampton precincts are joined with Newport News precincts.  Hampton precincts are combined with the City of Poquoson and York County in District 91.  Because Hampton's population of 146,437 could support two house electoral districts,[8] the trial court concluded that Hampton was "needlessly divided" into three districts "against all traditional race-neutral principles . . . ."

The trial court's conclusion was based on the following findings.  The boundary between House District 91 and House District 92 separated whites from African Americans, placing the African Americans in the majority minority District 92.  This boundary included three split precincts which the court

37

determined followed the pattern of placing African Americans in the majority minority district.[9]  The trial court also found that minority candidates were unopposed or won election in House District 92 with over 70% of the votes with a BVAP of 59.3%.

The remaining African-American precincts in Hampton were placed in House District 95 along with heavily African-American precincts from Newport News.  The western border of House District 95 abuts a majority white district, House District 94, and the adjoining white precincts were placed in District 94 and the African-American precincts in District 95. As in District 92, the trial court found that the minority candidate was elected by landslide votes with a BVAP of 59%.[10]

The defendants' evidence showed that Hampton had been split into more than two districts prior to the enactment of SB 1:  former House Districts 91, 92, and 95.  Both former Districts 92 and 95 were approximately 15% below the target population, and former District 91 was 8.5% below that target. The underpopulation was addressed by adding the rest of the City of Poquoson and part of York County to these districts.

---

[8] The target population for a house district is 70,785.

[9] A fourth split precinct was shared between Districts 92 and 95.

[10] The trial court stated that the BVAP was 59% at the time.  However, the 59% BVAP was based on the 2000 census and was not representative of the BVAP in 1991 or 1993.

While the area encompassed by House District 91 only retained 57% of the previous district, House Districts 95 and 92 retained 93.5% and 95.2%, respectively, of their core. The defendants' evidence also showed that the voting behavior of the districts correlated highly with race. The majority of the Democratic voters were retained in House Districts 92 and 95. The Hampton precincts included in the white majority District 91 were less Democratic than the neighboring Hampton precincts retained in the majority minority District 92. The evidence also showed that the split of the Magruder precinct between House District 91 and 92 placed more African Americans in the majority minority House District 92 than in the majority white House District 91.

This record establishes that the division of Hampton into 3 districts was not a new legislative decision, but followed a three-way division that existed for at least a decade. The evidence shows that the redistricting principles of population equality, partisan voting behavior, and avoiding retrogression all played a part in designing these two districts. As we have said before, the complainants bear a heavy burden in successfully challenging the constitutionality of these legislative acts. We find that this record does not support the trial court's conclusion that race was the predominant factor in designing House Districts 92 and 95.

39

b.  House District 74

In holding that House District 74 was racially gerrymandered in violation of Article I, §§ 1 and 11, the trial court cited the shape of the district including a 20 mile "land bridge," and the lack of community of interest between the African Americans in rural Charles City County and those in urban northern Henrico and the Hopewell portion of the district.  The trial court concluded that the "grabbing" of "small, isolated minority communities in Charles City County and the two precincts in the City of Hopewell in order to 'preserve' a majority-minority district with a population" having "no common traditional, economic, or community of interests with Henrico," amounted to the "suspect use of race as a proxy to further the neighboring incumbents interests."  Finally, the trial court observed that if avoiding retrogression was the General Assembly's goal, it could have created "four compact, politically cohesive majority-minority districts" in the Richmond, Henrico, and Chesterfield area.

The defendants produced evidence showing that the 1991 district was basically replicated in HB 1.  Although District 74 was below the target population for a house district, 98.3% of District 74 was retained while adding the requisite population.  The new district was more compact than the old, and its BVAP declined from 65.1% to 59.7%.

40

The defendants' evidence also showed that the incumbent representative in the neighboring district, District 62, was a Republican. Removing the strongly Democratic Hopewell precincts from District 62 made that district a "safer" district for the incumbent. Finally, the maps presented by both the complainants and the defendants showed that the "land bridge" between the Henrico and Charles City County portion of the district consisted of the precincts with the fewest Republican voters.

Based on this record, we conclude that the trial court erred in determining that race was the predominant factor in creating District 74. The record shows that race was a factor in designing the district along with traditional redistricting principles of retaining core areas, population equality, compactness and contiguity, partisan voting behavior, and protection of incumbents. The record does not support the conclusion that any of these factors were subordinated to race. Accordingly, we conclude that the trial court erred in holding that House District 74 was racially gerrymandered.

c. House Districts 69, 70, 71, 77, 80, 89, and 90

The trial court also concluded that the majority minority House Districts 69, 70, 71, 77, 80, 89, and 90 violated Article I, § 11. The only evidence cited in support of this conclusion was election results for these districts showing

41

that, with the exception of seven races, minority candidates received 74% or more of the votes in each election. The BVAP in these districts ranged from 53% to 64%, and, therefore, the court concluded that the districts were "packed," meaning that they were not narrowly tailored to meet the requirements of federal law. As stated above, whether districts were narrowly tailored to comply with federal requirements is a consideration not raised until the requisite finding of racial predominance is first made.

The trial court did not reference any specific evidence or make any specific findings for any of these districts to support a conclusion that race was the predominant factor in creating each district. It did, however, cite patterns it found in the creation of the districts that illustrated the "subordination of the traditional redistricting principles to race." These patterns included excessive splitting of jurisdictional lines, general disregard for keeping regions intact, abandoning the constitutional requirements of compactness and contiguity, and an inordinate use of split precincts in majority minority districts. The trial court, however, did not identify any particular district in which these patterns occurred.

We have already made clear that, in the absence of specific evidence in a specific district, such pattern

42

evidence alone cannot sustain the trial court's finding of racial discrimination.  We also note that the trial court's own holdings in this case belie its conclusion that matters of contiguity and compactness have been "generally disregarded" in creating the majority minority districts.  Of the 23 House and Senate districts challenged under Article II, § 6, the trial court found only six to be non-compact or non-contiguous.  These numbers do not support a conclusion that these constitutional requirements were "generally disregarded."

Finally, the trial court cited the high percentage of split precincts in majority minority districts as evidence of race-based district line drawing.  Specifically, the court found that the inclusion of 77% of the 61 precincts split statewide in the contested districts was not by "coincidence or happenstance."  However, other than those split precincts discussed above, the court fails to identify the location or specific impact of any other split precincts on the districts in question.

The record contains little evidence other than maps or general charts with regard to House Districts 71, 89, and 90.  Complainants' expert did not analyze these districts individually, and they are referenced in a single chart prepared by the complainants' expert to show that the

Democratic party voting percentage is higher than the BVAP in those districts.

The evidence adduced by the complainants to meet their initial burden of showing that race was the predominant factor in drawing these districts included testimony by their expert that in each district where African-American boundary precincts adjoined white precincts, the African-American precincts were placed in the majority minority district. This expert also cited three instances of split precincts in these districts that again placed more African Americans in the majority minority district. The complainants' witnesses also testified regarding the "barbell," "lobster," and "foot with toes" shapes of the districts which they contended resulted from the General Assembly's "stretching" districts to include African-American precincts. The complainants also argued that the evidence showed that in creating District 69, the General Assembly drew boundaries that crossed the James River to include four precincts that were heavily African American but did not include adjoining white precincts that were also heavily Democratic, supporting the proposition that the district was drawn on the basis of race, not politics.

The defendants' evidence included documents and testimony showing that the population in each of these districts was from 5% to 27% below the requisite level. In creating the

44

revised districts, the General Assembly retained the substantial amounts of the districts' cores:  63% in District 69, 70% in District 70, 95% in District 77, and 90% in District 80.  Of the three split precincts in these districts, the defendants' expert testified that two of the splits enhanced the compactness rating of the districts involved, Districts 69 and 77.  The splitting of the third precinct, the Bellwood precinct, resulted in 18.7% African Americans placed in District 70, and 16.2% African Americans placed in the majority white precinct, a difference which complainants' expert agreed was statistically insignificant and would not support a strong inference of race-based line drawing.

In response to the contention that white Democratic precincts were not included in majority minority District 69 while African-American precincts were, maps presented by both the defendants and the complainants showed that the white precincts adjoining the four African-American precincts north of the James River in District 69, while voting Democratic, generally reflected a lower level of Democratic voting behavior than the four African-American precincts that were included in House District 69.  Finally, with one exception, the BVAP in each district diminished.  The BVAP in District 77 grew by a single percentage point, from 55% to 56%.

We conclude that this record does not support the trial court's conclusion that "being black was the predominant factor in being chosen as part of a population making up the majority-minority districts."  As stated above, the use of race as a factor in designing these districts is conceded.  This record shows that along with race, accommodations for population equality, incumbency, and political party voting patterns were made by the General Assembly.

### C.  Alternative Plans

There is no dispute that in the districts involved in this case there is a high correlation between race and political affiliation.  Under these circumstances, the complainants have to show not only that race was the predominate factor in creating the districts at issue, but also that alternative designs were available that were consistent with traditional redistricting principles and that "would have brought about significantly greater racial balance."  Cromartie, 532 U.S. at 258.  However, the evidence of alternative acceptable plans is sparse.

The trial court stated that other districts could have been drawn in certain instances.  The trial court indicated the City of Hampton could have been contained in two House districts and did not need to be split three ways.  Similarly, the trial court stated that "four compact, politically

cohesive majority-minority districts can be created in the Richmond, Henrico, and Chesterfield area without stretching across vast geographical distances and prominent natural barriers and ignoring race-neutral criteria." Other than these statements, the trial court did not discuss the shape or qualities of such districts or reference any alternative districts offered by the complainants.

The only alternative districts in evidence were House Bill 2 (HB 2) and Senate Bill 4, generally referred to as the Robinson plan and the Miller plan, respectively. The primary analysis of these bills is found in attachments to the Senate and House submissions to the Department of Justice required by the VRA.

House Bill 2 did not limit Richmond, Henrico, and Chesterfield to 4 districts, nor did it divide Hampton into only two districts. The record shows that House Bill 2 split fewer precincts and localities than HB 1, but HB 2 also had a BVAP of less than 50.5% in six of the majority minority districts and had a higher population deviation between districts (+2.96 to −3.33). This record is devoid of any other alternative plans offered by the complainants. Indeed, at trial, counsel for complainants objected to the introduction of Senate Bill 4, stating the bill is "not part

of this case.  It's not part of our argument or part of the case that we are putting forward . . . ."

Accordingly, we hold that the complainants failed to carry their burden of proof as enunciated by the Supreme Court in Cromartie, thereby eliminating any application of the strict scrutiny standard.

CONCLUSION

In summary, for the reasons stated above, we will vacate the trial court's judgment with regard to House Districts 62, 83, 91, and 100 and Senate Districts 1, 6, and 13 because the complainants did not have standing to pursue claims against those districts.

We will reverse the judgment of the trial court holding that Senate District 2 and House District 4 violated Article II, § 6 of the Constitution of Virginia.

We will reverse the judgment of the trial court holding that Senate Districts 2, 5, 9, 16, and 18, and House Districts 69, 70, 71, 74, 77, 80, 89, 90, 92, and 95 violate Article I, §§ 1 and 11 of the Constitution of Virginia.  Final judgment will be entered in favor of the defendants.[11]

<u>Reversed and final judgment.</u>

JUSTICE HASSELL, concurring.

---

[11] In light of this holding, we need not address defendants' remaining assignments of error.

48

## I.

I agree with the opinion of the majority. I write separately solely to emphasize certain principles that govern my decision in this case. It is no surprise to anyone that this redistricting, like most, is highly political. The judiciary's sole function, however, is to determine whether legislative districts created by redistricting comport with the Constitution of Virginia. The judiciary, a separate, co-equal, and apolitical branch of government, must not concern itself with the political implications of the challenged redistricting plan.

Upon consideration of the Constitution of Virginia, relevant case law, and the decisions of the United States Supreme Court, I am compelled to conclude that the plaintiffs in this case failed to establish that race was the predominant factor that the General Assembly used in creating the legislative districts. Additionally, upon comparison of the majority black Senate district that this Court approved in 1992 in Jamerson v. Womack, 244 Va. 506, 423 S.E.2d 180 (1992), with the challenged legislative districts in this case, I can only conclude that the challenged legislative districts in this case do not violate Virginia's constitutional requirements of compactness and contiguity.

## II.

49

A.

HOUSE DISTRICT 74

Article II, § 6 of the Constitution of Virginia states that "[e]very electoral district shall be composed of contiguous and compact territory." The circuit court concluded that several Senate and House Districts violate these constitutional requirements. However, the only district that I find troublesome is House District 74 and, therefore, I will focus my discussion solely upon that district.

Without question, House District 74 has a bizarre shape. It has a configuration somewhat similar to a diagram of an "axe handle." However, a comparison of the record in this case with the record in Jamerson compels me to the inescapable conclusion that House District 74 is constitutionally permissible.

In Jamerson, we acknowledged several principles that we must apply here. We pointed out that legislative determinations of fact upon which the constitutionality of a statute may depend are binding upon this Court unless those determinations are clearly erroneous, arbitrary, or wholly unwarranted. Jamerson, 244 Va. at 509, 423 S.E.2d at 182. We recognized, however, that legislative conclusions based upon findings of fact are subject to judicial review when they are arbitrary and unwarranted. Id. We stated that every statute,

50

including a statute enacting a redistricting plan, has a "strong presumption of validity," and we held that "reapportionment 'is, in a sense, political, and necessarily wide discretion is given to the legislative body.' " Id. at 510, 423 S.E.2d at 182 (quoting Brown v. Saunders, 159 Va. 28, 36, 166 S.E. 105, 107 (1932)).

Additionally, in this appeal, just as in Jamerson, the General Assembly must comply with two overarching conditions: Article I, § 2 of the United States Constitution that compels "equal representation for equal numbers of people," often referred to as "one person, one vote," and compliance with the mandates of the federal Voting Rights Act, 42 U.S.C. § 1971-74e (2000). Of course, the Voting Rights Act requires that the General Assembly refrain from diluting black group voting strength in a redistricting. Jamerson, 244 Va. at 511, 423 S.E.2d at 183 (citing Wesberry v. Sanders, 376 U.S. 1, 17-18 (1964)).

I also observe, with great conviction, that this Court must be consistent in the application of its precedent. Fairness dictates that the same principles that this Court applied in Jamerson, which resulted in the approval of a black majority Senate district, must be applied in this case.

Applying these principles, I conclude that House District 74 satisfies Virginia's constitutional requirements of

51

contiguity and compactness. The reasons that justify approval of House District 74 are, in my opinion, more compelling than the reasons that required approval of Senate District 18 in Jamerson. In Jamerson, we rejected the plaintiffs' challenges to two districts; one of those districts was a Senate district with a majority black voting age population. This district, Senate District 18, extended from rural Halifax County to the City of Portsmouth. Senate District 18 also had a bizarre shape. Just like House District 74 in the present case, the challenged majority black voting district in Jamerson had a configuration that extended into a city which allowed the district to acquire a significant number of black voters. Unlike Senate District 18 that we approved in Jamerson, most of House District 74 has been in existence since 1990, and there is a much stronger community of interest within that district than Senate District 18. Furthermore, House District 74, which was created as a majority black district in 1991, is substantially similar today to its 1991 configuration, and contains 98.3% of the 1991 district which was approved by many of the legislator-plaintiffs in this case.

B.

Validity of Plaintiffs' Racial Challenge

The litigants agree that race must be a factor in the redistricting because of the mandate of the federal Voting

52

Rights Act.  However, race must not be the predominant factor.

As the Supreme Court stated in Easley v. Cromartie, 532 U.S.

234, 241-42 (2001):

> "The Court has specified that those who claim that a
> legislature has improperly used race as a criterion,
> in order, for example, to create a majority-minority
> district, must show at a minimum that the
> 'legislature subordinated traditional race-neutral
> districting principles . . . to racial
> considerations.'  [Miller v. Johnson, 515 U.S. 900,
> 916 (1995)].  Race must not simply have been 'a
> motivation for the drawing of a majority minority
> district,' Bush v. Vera, 517 U.S. 952, 959 (1996)
> (O'CONNOR, J., principal opinion) (emphasis in
> original), but 'the "predominant factor" motivating
> the legislature's districting decision,' Cromartie,
> 526 U.S. at 547 (quoting Miller, supra, at 916)
> (emphasis added).  Plaintiffs must show that a
> facially neutral law ' "is 'unexplainable on grounds
> other than race.' " '  [Cromartie, 526 U.S. at
> 546]."

The Supreme Court also made the following observation in

Easley v. Cromartie, that is pertinent here:

> "The Court also has made clear that the
> underlying districting decision is one that
> ordinarily falls within a legislature's sphere of
> competence.  Miller, 515 U.S. at 915.  Hence, the
> legislature 'must have discretion to exercise the
> political judgment necessary to balance competing
> interests,' ibid., and courts must 'exercise
> extraordinary caution in adjudicating claims that a
> State has drawn district lines on the basis of
> race,' id., at 916 (emphasis added).  Caution is
> especially appropriate in this case, where the State
> has articulated a legitimate political explanation
> for its districting decision, and the voting
> population is one in which race and political
> affiliation are highly correlated.  See Cromartie,
> supra, 526 U.S. at 551-[52] (noting that 'evidence
> that blacks constitute even a supermajority in one
> congressional district while amounting to less than

> a plurality in a neighboring district will not, by
> itself, suffice to prove that a jurisdiction was
> motivated by race in drawing its district lines when
> the evidence also shows a high correlation between
> race and party preference')."

Id. at 242.

Upon application of these principles to this case, I am persuaded that the plaintiffs failed to establish that the General Assembly used race as the predominant factor in the redistricting plan. Simply stated, the plaintiffs failed to prove their case as required by law. The undisputed evidence in the record before this Court is that in Virginia there is a high correlation between race and politics. The plaintiffs, therefore, were required to introduce, in evidence, an alternative plan that showed that the General Assembly could have achieved its political and traditional districting objectives without the specific racial configurations that the General Assembly actually used. The plaintiffs, however, failed to present an alternative plan that complied with the criteria required by Easley v. Cromartie.

Without question, this Court has a constitutional duty to invalidate a redistricting plan if the evidence demonstrates that race was the predominant factor in the creation of legislative districts. However, plaintiffs who challenge the redistricting plan have an obligation to prove their case, and in this instance the plaintiffs failed to satisfy that

54

obligation. The failure to satisfy this obligation is amply demonstrated by the testimony of plaintiffs' own expert witness, who testified that he neglected to consider certain basic factors that are highly relevant in any redistricting plan, including the factor of political incumbency. Dr. Allan J. Lichtman testified as follows:

> "Q: If you pick a district to study because it is black and compare it only to bordering districts that are white, wouldn't you expect to find that blacks are more heavily represented inside?

> "A: If you are drawing the district based on race, yes. If you are not drawing the district based on race, not necessarily. It could be that there are all kinds of borders even though the district is less heavily black that they share, that both have heavy concentrations of blacks or heavy concentrations of whites, and you wouldn't find that kind of consistent pattern. So, no, it doesn't follow.

> "Q: Well, let me ask you this: Did you look at the borders that you used to determine whether on the other side there were Republican incumbents or Democratic incumbents?

> "A: No.

> "Q: And you don't think that would make any difference in your analysis?

> "A: I tested the proposition that the lines were drawn on a political basis. I looked at the competitiveness of those districts. I did not look at the identity of the incumbents or what role they may or may not have played. I didn't see anything about that in any of the material presented by the State."

The plaintiffs' failure to establish that the General Assembly relied predominantly upon race rather than basic political considerations, such as incumbency, is fatal to the plaintiffs' case.  See Easley v. Cromartie, 532 U.S. at 241-42.