IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 3, 2024 Session

## GARY WYGANT, ET AL. v. BILL LEE, GOVERNOR, ET AL.

**Direct Appeal from the Chancery Court for Davidson County**
**No. 22-0287-IV**
**Russell T. Perkins, Chancellor; J. Michael Sharp, Judge; and**
**Steven W. Maroney, Chancellor**

———————————————————

**No. M2023-01686-SC-R3-CV**

———————————————————

HOLLY KIRBY, J., concurring in part and dissenting in part.

I agree with most of the majority's excellent opinion, including its conclusions concerning Mr. Wygant's claim. I write separately because I disagree with the majority's analysis and conclusion on Ms. Hunt's standing.[1]

With respect, on Ms. Hunt's claim, there is much the majority opinion doesn't talk about. As explained below, in denying that Ms. Hunt has standing, Tennessee becomes the first state in the nation to hold that a voter does not have standing to challenge the constitutionality of her own voting district. The State has cited no case from anywhere in the country—federal or state—holding what the majority now holds: that a voter who has been placed into an unconstitutionally-configured voting district suffered no harm from it and has no standing to challenge it. And the majority cites no such case in its opinion. Not one.

The majority doesn't talk about the fact that, like Mr. Wygant, Ms. Hunt asserts a district-specific claim. And like Mr. Wygant, Ms. Hunt is the object of the redistricting of her voting district; she alleges representational harm caused by the unconstitutional configuration of her district. State and federal cases across the country recognize that a voter who has been placed into an unconstitutionally configured district is harmed by the

---

[1] Citing *Case v. Wilmington Trust, N.A.*, 703 S.W.3d 274, 289 (Tenn. 2024), the majority concludes that the claim Ms. Hunt is asserting involves public rights. In this separate opinion, I refrain from reaching the issue of whether Ms. Hunt's claim involves public rights; I instead assume *arguendo* that Ms. Hunt's claim involves public rights. For that reason, I assume Ms. Hunt is required to show injury-in-fact, as noted in *Wilmington Trust*, and conclude that she has standing even with that assumption. *Wilmington Tr.*, 703 S.W.3d at 291 (noting that prior Tennessee cases requiring injury-in-fact involved public rights).

constitutional violation and has injury-in-fact to satisfy standing requirements like ours. *Case v. Wilmington Tr., N.A.*, 703 S.W.3d 274, 291 (Tenn. 2024) (noting Tennessee's injury-in-fact requirement for public rights cases).

The majority overlooks this established redistricting jurisprudence and erects additional hurdles for Ms. Hunt. This is error in and of itself.

But the majority's analysis of those additional hurdles is also flawed. Ms. Hunt in fact clears every one of them. She has sustained injury now in the form of a 3-1 staggered-term representative structure for District 17 and Davidson County, instead of the constitutionally-required 2-2 structure. Turnover will most certainly occur in District 17 and Davidson County, and injury from the unconstitutional 3-1 structure is certain to manifest each time it does. The redistricted map places Ms. Hunt in a different senate district with a new senator whom she perceives as not connected to her county. Ms. Hunt felt that her previous senator could understand her county's concerns, and the redistricting shortened the period of time she was represented by the previous senator. And Ms. Hunt now resides in a senate district whose misnumbering renders it unconstitutional. All of this is discussed further below.

First, consider what the majority doesn't talk about. Without question, Ms. Hunt asserts a district-specific claim, and the majority's analysis of Ms. Hunt's standing doesn't mention it. Ms. Hunt contends that the misnumbering of *her own* Senate voting district violates Article II, Section 3 of the Tennessee Constitution, which requires: "In a county having more than one senatorial district, the districts shall be numbered consecutively." Tenn. Const. art. II, § 3. She seeks only to correct the misnumbering of *her own* Senate district.[2] Her trial expert created an alternative Senate reapportionment plan that would remedy *that* constitutional violation. The entire trial court panel, including the dissent, viewed Ms. Hunt's claim as district-specific. Ms. Hunt's claim here is district-specific.[3]

Next, like Mr. Wygant, Ms. Hunt is the object of the redistricting of her Senate district. "[S]tanding depends considerably upon whether the plaintiff is himself an object

---

[2] Even if Ms. Hunt had not limited her own claim, the majority limits Mr. Wygant's statewide claim to a district-specific claim and the same would ordinarily be done for Ms. Hunt's claim.

[3] In its briefs before this Court, the State asserts that Ms. Hunt challenges the statewide map and argues that allowing her to bring this claim would constitute judicial overreach. In support, the State points to a statement made in the filings of Plaintiffs Gary Wygant and Akilah Moore during the temporary injunction proceedings. But Ms. Hunt had not joined the lawsuit at this point, and the statement in question cannot fairly be attributed to her. It is clear from the record of the proceedings below that the relief Ms. Hunt seeks is district-specific.

of the action . . . at issue.  If he is, there is ordinarily little question that the action . . . has caused him injury. . . .” *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992).  *See also Wilmington Tr.*, 703 S.W.3d at 283 n.8 (quoting same language in *Lujan*). Here, Ms. Hunt belongs to a unique subset of voters: she not only lives in District 17, she lives in the small *portion* of Davidson County located in District 17, which makes her district subject to the constitutional consecutive numbering requirement.  It is undisputed that District 17, Ms. Hunt’s new voting district, was misnumbered.  As a voter in District 17, Ms. Hunt was the “object” of the State’s unconstitutional misnumbering of her voting district.  *See Gill v. Whitford*, 585 U.S. 48, 66 (2018) (“[W]e have held that a plaintiff who alleges that he is the *object* of a racial gerrymander—a drawing of district lines on the basis of race—has standing to assert only that his own district has been so gerrymandered.” (emphasis added) (citing *United States v. Hays*, 515 U.S. 737, 744–45 (1995)).

As the object of the unconstitutional misnumbering of her Senate district, Ms. Hunt has sustained representational harm.  The United States Supreme Court has recognized “representational harm” in the context of racial gerrymandering, where harm to voters in a voting district arises from the tangible configuration of district in a way that violates constitutional standards.  *See*, *e.g.*, *Hays*, 515 U.S. at 744.  Summarizing its “standing principles,” the Court explained that “the harm asserted by the plaintiffs is best understood as arising from a burden on those plaintiffs' own votes,” which in a gerrymandering context arises from “a voter's placement in a” gerrymandered district.  *Gill*, 585 U.S. at 69.  For that reason, if a plaintiff “resides in a racially gerrymandered district, . . . the plaintiff has . . . standing to challenge the legislature's action.”  *Hays*, 515 U.S. at 745.

The same has been held as to violations of *state* constitutional provisions governing the structure of voting districts—like the Tennessee constitutional provisions at issue here.  For example, in *Wilkins v. West*, the plaintiffs alleged that certain reapportioned legislative districts in Virginia violated constitutional requirements of compactness and contiguity, and also that they were racially gerrymandered in violation of the Virginia Constitution. 571 S.E.2d 100, 106 (Va. 2002).  As to the racial gerrymandering allegations, the Virginia Supreme Court adopted the reasoning on standing used by the United States Supreme Court in *Hays*.  *Id*. at 106–07 (citing *Hays*, 515 U.S. at 743).  On the alleged violations of the state constitutional provisions on compactness and contiguity, the *Wilkins* Court likened the harm caused by these provisions to “representational harms” suffered in racial gerrymandering cases, and it adopted the same standard:

> While this standard was developed in the context of racial gerrymandering
> claims, we believe the same standard is appropriate to establish standing for
> allegations that electoral districts violate the compactness and contiguous

requirements of Article II, § 6 of the Constitution of Virginia. If a district fails to meet the compactness and contiguous requirements, residents of that district are directly affected by the legislature's failure to comply with the Constitution of Virginia. In the absence of residency in a challenged district, a complainant can establish standing only by showing a particularized injury.

*Id*. at 107. The *only* evidence of injury produced by the plaintiffs in *Wilkins* was proof of residency in their legislative districts. *Id*. at 106. That was enough. The *Wilkins* Court recognized that residents in the challenged electoral districts sustained representational harm from being placed into unconstitutionally configured districts and had standing to assert district-specific claims.[4] *Id*. at 107.

Similarly, in *Abbott v. Mexican American Legislative Caucus, Texas House of Representatives,* a redistricting case cited in the majority opinion, the Texas Supreme Court held that an individual voter had an injury-in-fact for purposes of standing for allegations that the reapportioned district violated county-splitting prohibitions in the Texas constitution. 647 S.W.3d 681, 695 (Tex. 2022).[5] As a resident of the county and of the partial district that had been split, the voter established particularized injury to challenge the allegedly unconstitutional split into two districts.[6] *Id*. ("[W]e agree that Cortez has sufficiently alleged a particularized injury as a Cameron County (and, notably, as a District 37) resident."). If a resident of the county at issue did not have standing to pursue a claim

---

[4] The Virginia Supreme Court held that residence in an allegedly unconstitutional district shows particularized injury without the need for further proof. *Wilkins*, 571 S.E.2d at 107 (explaining that the particularized injury requirement applies to claims of an unconstitutionally-configured district, including but not limited to racial gerrymandering, and residents of the affected district suffer "representation harm" and are "directly affected" by the constitutional violation, so they are deemed to have standing "without further proof of personalized injury" beyond proof of residency).

[5] Texas follows the federal requirements for standing, including the requirement for a particularized injury-in-fact. *See Abbott*, 647 S.W.3d at 690 (citations omitted).

[6] The voter originally also alleged injury as a *candidate* in the district, but the holding was not based on his allegations of candidate status. *Abbott*, 647 S.W.3d at 695 n.4. It was based only on his residence in the challenged district.

In *Abbott*, notwithstanding the finding of particularized injury, the court noted that the individual plaintiffs had sued the wrong defendant; they sued only the State of Texas. *Id.* at 697–98. Their injuries were not traceable to the State of Texas, so the individual plaintiffs "failed to meet the traceability element of standing." *Id.* at 698. The Court found this defect was "curable" and remanded to give the individual plaintiffs an opportunity to replead. *Id.* at 704. There are no allegations in this case that Ms. Hunt sued the wrong defendant.

under that constitutional provision, the Texas Supreme Court said, "we struggle to envision a plaintiff who would." *Id*. at 693. *Abbott* described "[v]oting in a lawfully apportioned district" as "a personal right." *Id*. at 694.

Thus, for state constitutional provisions that seek to enhance voter communities, such as county integrity, contiguity, and the like, states view reapportionment violations as causing district residents a type of representational harm sufficient to satisfy injury-in-fact requirements, not unlike voters in United States Supreme Court cases involving racially gerrymandered districts. *See*, *e.g*., *Abbott*, 647 S.W.3d at 694; *Wilkins*, 571 S.E.2d at 107; *Graham v. Sec'y of State Adams*, 684 S.W.3d 663, 677 (Ky. 2023) ("[T]he Apportionment Plans interfere with their interest in translating their votes into representation under fair and constitutional apportionment plans. . . . As such, the standing requirement of actual, concrete, and particularized injury is satisfied"). *See also In re Reapportionment of Towns of Hartland, Windsor & W. Windsor*, 624 A.2d 323, 330 (Vt. 1993) ("All of the nonnumerical criteria at issue here. . . are not only important but are related to one another in that they share the common purpose of assuring more effective representation."). *Cf*., *Hays*, 515 U.S. at 745 (referring to "the special representational harms racial classifications can cause in the voting context").

Here, Ms. Hunt also describes her claim in terms of representational injury or harm. Her complaint alleges that the new Senate map violates her "constitutional right, as a Davidson County resident and voter, to representation by a consecutively numbered county senatorial delegation and her right to vote in a senatorial district constructed in compliance with the Tennessee Constitution." In opening statements at trial, her counsel said she had been "denied the opportunity to vote for . . . a staggered term senate delegation, and to be represented by it." Ms. Hunt's brief to this Court refers to the "unique voting rights" the Tennessee Constitution gives citizens of populous counties, including the "constitutional right to be represented in the State Senate as a political group by senators subject to election by all voters within that political group," the "constitutional right to vote in a senatorial district consecutively numbered with the other senatorial districts in her county of residence," and "the political power to elect staggered-term legislative delegations regardless of the unique dynamics of any given election."

Ms. Hunt's claim is similar to Mr. Wygant's claim. Mr. Wygant's claim is based on Section 5 of Article II of our Constitution, while Ms. Hunt's claim is based on Section 3 of Article II. As is clear from the text and history of both sections, both implicate the same concerns for preserving counties as cohesive units of representation.[7] Both

---

[7] Counties are a predominant political subdivision in Tennessee's Constitution. The word "county" (or a variation of the word) is used over 115 times in our modern Constitution. The focus on counties began

provisions were added to the Constitution in 1966 with the objective of improving representation and advancing the shared political interests of the county as an entity.[8] Our constitutional history and redistricting jurisprudence recognize the importance of the interests served by these provisions. *See State ex rel. Lockert v. Crowell*, 631 S.W.2d 702, 709 (Tenn. 1982) ("*Lockert I*") (noting that there are "excellent policy reasons for the presence of a provision that counties must be represented in the Senate," including the legislature's ability to pass legislation with local application and effects); *State ex rel. Lockert v. Crowell*, 656 S.W.2d 836, 840 (Tenn. 1982) ("*Lockert II*") (noting that in federal

---

with the State's founding, and Tennessee's earliest Constitution included provisions to protect county integrity in apportionment by prohibiting the division of counties to form senatorial districts. *See* Tenn. Const. art. II, § 4 (1796) ("When a District shall be composed of two or more Counties, they shall be adjoining, and no County shall be divided in forming a District."); Tenn. Const. art. II, § 6 (1834) ("When a district is composed of two or more counties, they shall be adjoining; and no county shall be divided in forming a district."); Tenn. Const. art. II, § 6 (1870) ("When a district is composed of two or more counties, they shall be adjoining; and no county shall be divided in forming a district.").

[8] Article II, Section 3 was the subject of much discussion at the 1965 Constitutional Convention. Transcript of the Proceedings (Aug. 11, 1965) *in Journal and Proceedings of the Limited Constitutional Convention of Tennessee* 502–11 (1966), https://hdl.handle.net/2027/uc1.b4181359 (hereinafter *Constitutional Convention*); Transcript of the Proceedings (Aug. 12, 1965) *in Constitutional Convention*, *supra*, at 541–53; Transcript of the Proceedings (Nov. 30, 1965) *in Constitutional Convention*, *supra*, at 817–20. As the text of the Convention's *Journal* makes clear, the primary purpose of Article II, Section 3 was to produce more effective representation for counties as a whole by letting Senators gain legislative experience and focus less on campaigning. *See* Statement of James L. Bomar (July 29, 1965) *in Constitutional Convention*, *supra*, at 413 ("It was felt that by extending the term of Senators to 4 years, greater continuity of service and experience would be gained. . . Its enactment is in line with modern views for improved legislative process."); Statement of Frierson M. Graves, Jr. (Aug. 12, 1965) *in Constitutional Convention*, *supra*, at 541–42 ("Why did we stagger the terms of Senators? And why did we increase the terms? . . . [E]xperience gained during the first part of a session or during the legislator's time in office would . . . make the Senate a more deliberative body in their actions"); *id.* at 544 (In a four-year term, senators "can give better service to the State").

The structure for enhanced representation for counties included the consecutive numbering provision. *See* Statement of Frierson M. Graves, Jr. (Aug. 11, 1965) in *Constitutional Convention*, *supra*, at 502–03 ("Now in order to stagger the terms of office we provided that there would be two classes of Senators and the easiest way of division would be in the even and odd-numbered senatorial districts in which we are divided . . . . In order to provide that there would be equal rotation in counties that had more than one senatorial district, we provided that these counties would be numbered consecutively . . . . The whole purpose being so that there will be approximately one-half of the Senators experienced and only one-half coming up for election each time, but with a whole group of Representatives coming up for election and responsibility to the people on a two-year basis."). *See also* Statement of Richard Fisher (Dec. 1, 1965) *in Constitutional Convention*, *supra*, at 896–97 ("I believe that any county . . . needs representation of it as an entity and its entirety in state government. It has problems that are broad in scope, broader than these districts in which the county will be divided[.]").

equal protection contexts, "a constitutionally backed state policy of preserving county boundaries will clearly be given high priority in the table of legitimate state policy considerations to justify variances from the ideal").

While the majority acknowledges that Mr. Wygant suffered a type of representational harm, it does not even mention representational harm in connection to Ms. Hunt. But analytically, they are the same. Ms. Hunt's placement into a district that is not consecutively numbered, as required under Article II, Section 3, deprives her of the full panoply of constitutional protections intended to improve legislative representation for populous counties. In short, she has suffered "representational harm."

And, like Mr. Wygant, Ms. Hunt's representational harm is injury-in-fact, sufficient to give her standing to assert a district-specific claim.[9]

This is the norm in state redistricting jurisprudence. Across the nation, voters have been allowed to challenge the constitutionality of their own voting districts. States recognize the representational harm sustained by voters who are placed into a voting district that violates constitutional standards—and recognize that it gives them standing.

Here, neither the State nor the majority cites a redistricting case in which a voter in Ms. Hunt's position—who asserts a district-specific claim challenging the constitutionality of *her own* legislative district—was found *not* to have sustained particularized injury for standing. Not even one. And I have found none.

Surveying the states, a number have either constitutional provisions or a statute granting standing to voters or public officials to challenge reapportionment.[10]

---

[9] The majority inaccurately describes my position as "a voter *always* has standing to challenge the constitutionality of the voter's own voting district, regardless of the nature of the voter's claim or alleged injury." Respectfully, in this separate opinion, I do not offer an advisory opinion about such a situation, as it is not presented here. Here, Ms. Hunt was placed into an unconstitutionally configured senate district; she was directly affected by the redistricting and has alleged ample representational harm caused by it. My position is that her representational harm gives her standing in this case.

[10] *See, e.g.*, Alaska Const. art. VI, § 11 (granting standing to "[a]ny qualified voter"); Ark. Const. art. VIII, § 5 ("any citizen[] and taxpayer[]"); Cal. Const. art. XXI, § 3(b)(2) ("any registered voter"); Conn. Const. art. III, § 6d ("any registered voter"); Del. Const. art. II, § 2A ( "[a]ny qualified voter"); Haw. Const. art. IV, § 10 ("any registered voter"); Iowa Const. art. III, § 36 ("any qualified elector"); Me. Const. art. IX, § 24(3) ("any citizen or group of citizens"); Md. Const. art. III, § 5 ("any registered voter"); Mass. Const. amend. art. CI, § 3 ("any voter of the Commonwealth"); Mo. Const. art. III, § 7(i) ("an eligible Missouri voter who sustains an individual injury by virtue of residing in a district that exhibits the alleged

- 7 -

In the majority of state redistricting cases, with or without such provisions, the standing of plaintiff voters to challenge reapportionment of their own voting district has never been questioned.[11]  Until the present case, Tennessee also fell into this category.[12] *See, e.g.*, *Lockert I*, 631 S.W.2d at 704 (standing of voters in affected districts "not in issue"); *Lockert II*, 656 S.W.2d at 840 (standing of voters not questioned); *State ex rel. Lockert v. Crowell (Lockert III)*, 729 S.W.2d 88 (Tenn. 1987) (same).

But in every state redistricting case where standing is discussed, courts have recognized that voters who are redistricted into an unconstitutionally-configured district

---

violation, and whose injury is remedied by a differently drawn district"); N.Y. Const. art. III, § 5 ("any citizen"); Okla. Const. art. V, § 11C ("[a]ny qualified elector"); Or. Const. art. IV, § 6(2)(a) ("any elector"). *See also* Mich. Comp. Laws § 4.18 ("any elector"); Minn. Stat. § 200.57(a) ("any individual aggrieved by a violation of this act").

[11] *See, e.g.*, *Rice v. English*, 835 So. 2d 157, 159 (Ala. 2002); *Arizona Minority Coal. for Fair Redistricting v. Arizona Indep. Redistricting Comm'n*, 208 P.3d 676, 682 (Ariz. 2009) (en banc); *Blum v. Schrader*, 637 S.E.2d 396, 397 (Ga. 2006); *Pentico v. Idaho Comm'n for Reapportionment*, 504 P.3d 376, 379 (Idaho 2022); *Durst v. Idaho Comm'n for Reapportionment*, 505 P.3d 324, 328 (Idaho 2022); *State ex rel. Welsh v. Marion Super. Ct., Room 5*, 185 N.E.2d 18, 19 (Ind. 1962); *Rivera v. Schwab*, 512 P.3d 168, 173, 177 (Kan. 2022); *Wattson v. Simon*, 970 N.W.2d 42, 44–45 (Minn. 2022); *Mauldin v. Branch*, 866 So. 2d 429, 430 n.2 (Miss. 2003); *Pick v. Nelson*, 528 N.W.2d 309, 313 (Neb. 1995); *Grisham v. Van Soelen*, 539 P.3d 272, 276 (N.M. 2023); *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 195 N.E.3d 974, 978 (Ohio 2022); *State ex rel. Cooper v. Tennant*, 730 S.E.2d 368, 373–76 (W. Va. 2012).

[12] The majority suggests we should ignore cases where the standing of voters who live in the challenged district was not questioned, including our own.  But in jurisdictions where "standing is a question of subject matter jurisdiction that can never be waived and that courts must raise *sua sponte*," the fact that a redistricting case is addressed on the merits "implicitly supports that plaintiffs similarly situated . . . have standing." *Pereira v. Town of N. Hempstead*, 682 F. Supp. 3d 234, 243 (E.D.N.Y. July 13, 2023). *See also Baker v. Carr*, 369 U.S. 186, 206 (1962) (holding that the plaintiffs had standing and noting that prior decisions "have assumed rather than articulated the premise in deciding the merits of similar claims").

Indeed, a case relied upon by the majority in analyzing Ms. Hunt's standing does just that. *See State ex rel. Steinke v. Lautenbaugh*, 642 N.W.2d 132, 138 (Neb. 2002) ("[B]y reaching the merits and determining that the statute requiring election by subdistrict was constitutional, *Barnett* implicitly recognized that the plaintiffs had standing to bring the action.").

And regardless, these cases are part of the national landscape, in which state and federal courts have uniformly recognized that a voter who has been placed into an unconstitutionally configured voting district has standing to challenge the constitutionality of her own district.

are harmed by it and have standing to challenge the constitutionality of their own districts.[13] States recognize representational harm and injury based on the voter's "placement" into the challenged district.[14]  *Gill*, 585 U.S. at 69.

In sum, the topics omitted from the majority's analysis of Ms. Hunt's claim are plenty to show that Ms. Hunt has standing to challenge the constitutionality of her Senate district.  As a voter in the challenged Senate district, Ms. Hunt is the object of the unconstitutional misnumbering of that district and was harmed by it.  She maintains a district-specific claim asserting representational harm.  Based on established redistricting jurisprudence the majority acknowledges as to Mr. Wygant, it's apparent that Ms. Hunt likewise satisfies the requirements for standing.

The Court here need not go further to assess Ms. Hunt's standing.  Under long-accepted redistricting caselaw, as a voter redistricted into an unconstitutional voting district, she is recognized as having sustained representational harm from the constitutional violation.

But the majority here bypasses Ms. Hunt's representational harm and then erects additional hurdles before her.  This is error.  And on top of that error, its analysis on those additional requirements is flawed.[15]  As explained below, Ms. Hunt clears all of the hurdles the majority erects.

---

[13] *See, e.g.*, *Abbott*, 647 S.W.3d at 693, 695; *Wilkins*, 571 S.E.2d at 107; *Faatz v. Ashcroft*, 685 S.W.3d 388, 396 (Mo. 2024) (en banc) ("Each Appellant lives in a district in which a community has been split in alleged violation of the Missouri Constitution and, therefore, has standing to challenge the Senate Map."). *Cf. In re Reapportionment*, 624 A.2d at 335 ("[W]e agree with the State that petitioners have no standing to raise [a claim based on compactness, contiguity, and common interest requirements in the state constitution] because they do not reside in the challenged district.").  Some courts that have addressed standing do not even require district residency. *See, e.g.*, *Carpenter v. Hammond*, 667 P.2d 1204, 1208–09 (Alaska 1983) (holding registered voter in Alaska seeking to challenge a reapportionment plan even though "she does not reside in or near the challenged district" had standing under constitution and Alaska common law); *Graham*, 684 S.W.3d at 677 (finding standing for voters' claims based on representational harm without considering district residency); *Harkenrider v. Hochul*, 197 N.E.3d 437, 444–45 (N.Y. 2022) (holding New York voters had standing to challenge reapportionment in districts in which they did not live).

[14] This survey of state redistricting cases renders implausible the State's notion that permitting a voter such as Ms. Hunt to challenge the constitutionality of her own voting district offends separation of powers.  If it did, surely the State would have discovered *one* other court that denied standing to a voter who lived in the challenged district based on separation of powers.  It cited no such case.

[15] I respond to the majority's analysis on its own terms, but overall, its over-focus on short-term effects like the outcome of the most recent senate election for District 17 and Davidson County is concerning.  The constitutional provisions at issue in this appeal govern structural elements for legislative

Take its discussion of whether Ms. Hunt's harm is "actual or imminent." The majority briefly frames the objective of the consecutive numbering requirement in Article II, Section 3 as "designed to promote political stability by preventing all the Senate positions in a particular county from turning over at the same time."[16] The majority seems to characterize the protections of the provisions in Article II, Section 3 as meant to prevent "greater-than-usual turnover." It then says that the fact that "only one of the three Davidson County Senate seats up for election 2022 turned over" leads inevitably to the conclusion that Ms. Hunt's injury is "conjectural" or "hypothetical" or a "mere possibility." This is incorrect.

The citizens who ratified Article II, Section 3 well understood that voters may return senators to office term after term. The near-term results of the most recent election are not relevant to the assessment of Ms. Hunt's injury. The consecutive numbering provision was not intended to *prevent* turnover or "greater-than-usual turnover," whatever that means. As is evident from the text, it is intended to work with the other provisions in Article II, Section 3 to provide voters with better representation *when turnover occurs*.

The provisions in Article II, Section 3 link senate districts in populous counties to enhance the representation of their shared interests.[17] One mandates that counties with two

districts that are intended to affect election results over the long term, but the majority's analysis focuses mainly on immediate effects. For example, for Mr. Wygant, the majority dismisses his complaint that Gibson County is no longer represented by a Gibson County resident by saying that "it will always be possible that Gibson County's representative could reside in a different county." This is corrosive reasoning. It is hard to imagine a court in a racial gerrymandering case making a similar observation, that the election of a white candidate is "always a possibility" in a district that includes some white citizens. *Cf. Petteway v. Galveston Cnty.*, 667 F. Supp. 3d 447, 464 (S.D. Tex. 2023) (rejecting defendants' argument that plaintiff's racial gerrymandering case was moot because the county executive appointed an African American to serve in the disputed new district).

[16] The majority interjects a comment that "even assuming" deprivation of its intended enhancement to stability of representation "would constitute the sort of 'distinct and palpable' injury that suffices to establish standing . . . ." This seems to suggest that it is questionable whether the consecutive numbering requirement accomplishes anything at all. Respectfully, that's not our call to make. Our job doesn't include assessing whether the consecutive numbering requirement is effective in providing its intended benefit to voters. That assessment was made by the voters who ratified the 1966 amendments to the Constitution.

[17] Ms. Hunt alleges this type of injury, asserting that she "suffers an individualized injury every time she votes in District 17 because District 17's misnumbering dilutes the political power of her vote as compared to the voters in the state's other populous counties." Enhancing the representation of District 17, as linked to the other Davidson County senate districts, can fairly be characterized as leveraging the political power of voters in District 17.

- 10 -

or more senators are divided into "separate districts."[18]  Tenn. Const. art. II, § 6.  Another extends the term of senators from two years to four years but provides staggered terms, with half up for election every two years.  Tenn. Const. art. II, § 3.  And the provision at issue here requires consecutive numbering of senate districts in populous counties with multiple districts. Tenn. Const. art. II, § 3.  The text and the history of the provisions in Article II, Section 3 show they were meant to work together—long term—to enhance voters' representation.[19]  They are "not only important but . . . related to one another in that they share the common purpose of assuring more effective representation."  *In re Reapportionment*, 624 A.2d at 330.  *See Lockert I*, 631 S.W.2d at 709 (noting that there are "excellent policy reasons for the presence of a provision that counties must be represented in the Senate").

Here, we may not know when, but we know for sure that turnover in representation for District 17 and Davidson County *will* occur.  One way or another, even the most successful legislators will eventually leave office.  That's neither "conjectural," "hypothetical," nor a "mere possibility."  It's a certainty.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (holding that an injury is imminent if it is "certainly impending").  *Cf. McConchie v. Scholz*, 567 F. Supp. 3d 861, 875 (N.D. Ill. 2021) (for redistricting claims, "probability of future injury counts as injury for the purpose of standing") (cleaned up).

---

[18] The debate on this provision centered on whether division into separate districts should be mandatory or permissive, and whether those counties should be represented by senators at-large or senators from separate districts.  *See* Transcript of the Proceedings (Dec. 1, 1965) *in Constitutional Convention*, *supra*, at 890–99; Transcript of the Proceedings (Dec. 9, 1965) in *Constitutional Convention*, *supra*, at 967–68.

[19] For example, delegates of the Limited Constitutional Convention of 1965 explained:
Now in order to stagger the terms of office we provided that there would be two classes of Senators and the easiest way of division would be in the even and odd-numbered senatorial districts in which we are divided . . . . In order to provide that there would be equal rotation in counties that had more than one senatorial district, we provided that these counties would be numbered consecutively . . . . The whole purpose being so that there will be approximately one-half of the Senators experienced and only one-half coming up for election each time. . . .

Statement of Frierson M. Graves, Jr. (Aug. 11, 1965) *in Constitutional Convention, supra*, at 502–03. Another delegate explained: "I believe that any county . . . needs representation of it as an entity and its entirety in state government."  Statement of Richard Fisher (Dec. 1, 1965) *in Constitutional Convention* at 896–97.

And when turnover occurs, Ms. Hunt will have a 3-1 staggered representative system for the county's four senate districts, instead of the constitutionally required 2-2 staggered representative system. *See* Tenn. Const. Art. II, § 3. This isn't a "statistical probability" as asserted by the majority; it's a certainty. *Clapper*, 568 U.S. at 409. Ms. Hunt has been denied the more effective senate representation our Constitution requires for her.

Thus, Ms. Hunt's injury is both immediate and future. Right here and now, Ms. Hunt has lost the staggered-term representational structure guaranteed by the Tennessee Constitution and enjoyed by other populous counties. And forevermore under the challenged Senate map, every time District 17 and Davidson County experience turnover in representation, voters in District 17 will have a 3-1 staggered representative system for Davidson County's four senate districts instead of the constitutionally required 2-2 staggered system. *See* Tenn. Const. Art. II, § 3.

The majority also quibbles with Ms. Hunt's description of her injury as, in some respects, akin to vote dilution. It criticizes that the unconstitutional misnumbering of Ms. Hunt's Senate district "does not implicate the one-person, one-vote principle," does not "involve gerrymandering," and "does not affect the weight or strength of her vote," so it is not vote dilution. But differentiating Ms. Hunt's harm from the harm in other cases doesn't show she sustained no harm.

Ms. Hunt readily acknowledged that her claim was "not vote dilution in the framework of a malapportionment case." Her counsel described it instead as a diminution "of essentially the political power of your vote" because Davidson County voters in District 17 did not have the representational strength afforded to other populous counties under the constitutionally required 2-2 staggered representative system.[20] Her brief described it as "diluting the political weight of [Davidson County voters] as compared to the votes of the citizens of the State's other populous counties."[21]

These arguments merely describe the type of representational harm Ms. Hunt sustained from this particular constitutional violation. This is done in other redistricting

[20] Asked to explain the nature of Ms. Hunt's "vote dilution" claim at oral argument, Ms. Hunt's counsel explained that it was "in some respects vote dilution, but not vote dilution in the framework of a malapportionment case. Vote dilution in a diminishment of essentially the political power of your vote because our Constitution as amended . . . included a long-recognized benefit of continuity and stability within government by creating staggered terms, and afforded that right to the citizens of populous counties."

[21] Ms. Hunt also argued that "District 17's misnumbering dilutes the political power of her vote as compared to the voters in the state's other populous counties."

- 12 -

cases that are not gerrymandering. For example, the *Abbott* case cited by the majority alluded to the plaintiffs' description of their county-splitting claims as "representational dilution," in that county residents' voting power would be diluted by being split. *Abbott*, 647 S.W.3d at 692. The provisions in Article II, Section 3, including the consecutive numbering provision, "share the common purpose of assuring more effective representation." *In re Reapportionment*, 624 A.2d at 330.

In the same vein, the majority sums up Mr. Wygant's allegations: "In essence, Wygant is alleging that the split of Gibson County reduces the effectiveness of his representation in the House." The majority accepted this as representational harm to Mr. Wygant. Ms. Hunt describes her injury from the unconstitutional misnumbering of her senate district in a similar way. Like Mr. Wygant, she has sustained representational harm.

Consider next the majority's conclusion that Ms. Hunt was not injured because "[t]he new map moved Hunt from District 18, which voted for state senators in presidential election years, to District 17, which voted for state senators in gubernatorial election years," so Ms. Hunt's "opportunity to vote was accelerated, not delayed."[22] But voters

---

[22] The case cited by the majority in support of this conclusion, *State ex rel. Steinke v. Lautenbaugh*, 642 N.W.2d 132 (Neb. 2002), is pretty thin gruel. The majority describes it as "concluding that voter had standing to challenge renumbering of legislative districts where his vote was delayed." But *Steinke* does not involve unconstitutional legislative districts; the plaintiffs there asserted that a county election commissioner exceeded his *statutory* authority by renumbering school board districts. 642 N.W.2d at 136 (citing Neb. Rev. Stat. §§ 32-552, -553 (1998 & Supp. 2001)).

Because *Steinke* was not a constitutional redistricting case, it did not even consider the "special representational harms" that occur in constitutional redistricting settings. *Cf. Hays*, 515 U.S. at 745 (noting that voters in racially gerrymandered districts in violation of equal protection may suffer "special representational harms"); *Wilkins*, 571 S.E.2d at 107 (adopting representational harm standard for "allegations that electoral districts violate the compactness and contiguous requirements of Article II, § 6 of the Constitution of Virginia"). And it did not pretend to describe the minimum parameters for standing in constitutional redistricting cases.

And the majority's analysis as to *Steinke* veers uncomfortably close to reasoning by negative inference or denying the antecedent. An example of this type of unsound reasoning is:

> If it is snowing, then it is cold outside.
> It is not snowing.
> Therefore, it is not cold outside.

Here, the majority describes *Steinke* as "concluding that [a] voter had standing to challenge renumbering of legislative districts where his vote was delayed." Because the redistricting here caused the election to

- 13 -

with similar injury have been deemed to have standing to challenge the constitutionality of their voting districts.

For example, in *Pereira v. Town of North Hempstead*, plaintiff McHugh resided in District 5 prior to redistricting of town board voting districts; after redistricting, he resided in District 4. 682 F. Supp. 3d 234, 242 (E.D.N.Y. 2023). The town board had staggered terms of office by district number, and the redistricting caused the plaintiff's next election date to fall two years earlier. *Id.* Similar to the reasoning of the majority here, the defendants in *Pereira* argued that McHugh was not injured because his ability to vote for a new representative was not delayed, it was "accelerated." *Id.* The federal district court rejected this argument:

> While it is a close call, the Court finds that Plaintiffs have alleged enough to show that McHugh suffered an injury in fact. In *Gill v. Whitford*, the Supreme Court articulated that Article III standing "is best understood as arising from a burden on . . . plaintiffs' own votes," which in the "gerrymandering context . . . arises through a voter's placement in a[n]" allegedly unconstitutional district. 138 S. Ct. at 1931. Here, McHugh has alleged district-specific harm that is concrete and particularized—he alleges that he will be in a different district in the new map, with a new representative, and will be represented for only two years by his current representative when he previously would have been represented for four.

*Id.* *See id.* at 243 (stating that "at least one federal court has found that similarly situated plaintiffs had standing" (citing *League of Women Voters of Chicago v. Wolf*, 965 F. Supp. 2d 1007, 1011 (N.D. Ill. 2013), *aff'd sub nom.*, *League of Women Voters of Chicago v. City of Chicago*, 757 F.3d 722 (7th Cir. 2014)).[23]

As in *Pereira*, after the redistricting, Ms. Hunt is in a different district, with a new senator. Prior to being "swapped," Ms. Hunt was in District 18 with Senator Ferrell Haile. After being swapped, Ms. Hunt is now in District 17 with Senator Mark Pody. Ms. Hunt met with Senator Haile several times as her senator and felt he could understand the issues in the urban area where she lives. But the redistricting moved Ms. Hunt from a

---

be accelerated and not delayed, the majority simply concludes that, therefore, Ms. Hunt does not have standing. This is inherently unsound reasoning.

[23] The majority does not attempt to distinguish *Pereira* on injury-in-fact, the issue for which the case is cited.

consecutively numbered district (District 18) to a non-consecutively numbered district (District 17) and shortened the time in which she was represented by Senator Haile.[24]

And Ms. Hunt's injury is more pronounced than the plaintiff's injury in *Pereira*. While plaintiff McHugh's claim in *Pereira* was based only on the "swapping" of his voting districts, *id*. at 241–44, the Tennessee Constitution renders the numbering of Ms. Hunt's new senate district unconstitutional. Consequently, Ms. Hunt was "swapped" from a constitutionally numbered senate district into an unconstitutionally-numbered district. *See*, *e.g*., *Common Cause Fla. v. Byrd*, 726 F. Supp. 3d 1322, 1358 (N.D. Fla. 2024) (plaintiffs alleged redistricting resulted in race-based vote dilution) (stating that the plaintiff "credibly testified that he has lived in Tallahassee since 1982, that he is a registered and active voter, that he intended to vote in future elections, that he was in the former Benchmark CD-5, and that he is now in the Enacted CD-2. That is enough to demonstrate his standing."). *Cf*. *Gill*, 585 U.S. at 69 ("[T]he harm asserted by the plaintiffs is best understood as arising from a burden on those plaintiffs' own votes. . . . [T]hat burden arises through a voter's placement in" an unconstitutionally configured district.).

And, like Mr. Wygant, Ms. Hunt provided factual testimony on how the "swap" from a constitutional senate district to an unconstitutional district detrimentally affected the representation of her interests and the interests of her county. In her deposition,[25] Ms. Hunt testified that the switch from Senator Haile to Senator Pody "frustrated" her. She

---

[24] Faced with yet another particularized injury, the majority pivots to causation and redressability. It interposes that there is no causal connection between Ms. Hunt's dissatisfaction with her current representative and the non-consecutive numbering of her district. Pshaw. "[T]he causation element is not onerous" and only requires "a showing that the injury to a plaintiff is fairly traceable to the conduct of the adverse party." *City of Memphis v. Hargett*, 414 S.W.3d 88, 98 (Tenn. 2013) (cleaned up). As the majority itself points out, "the new map moved Hunt from District 18 . . . to District 17" and "accelerated" her election date. The fact that Ms. Hunt was more satisfied with her representation by Senator Haile gives context to why she was harmed by shortening the time Senator Haile represented her and by her placement into a new district with another senator. As in *Pereira*, this is representational harm that gives her standing to challenge her placement into an unconstitutionally configured voting district. 682 F. Supp. 3d at 242.

And we should not lose sight of Ms. Hunt's *primary* representational harm. She now has a 3-1 staggered representative system for the county's four senate districts, instead of the constitutionally required 2-2 staggered representative system. Without question, this injury is caused directly by the violation of Art. II, § 3 of the Tennessee Constitution and would be redressed by renumbering or redistricting to comply with the Constitution.

[25] The issue of standing came before the panel as part of the parties' competing motions for summary judgment. Both parties submitted Ms. Hunt's deposition to the panel for consideration and relied on it in their respective motions. In its order addressing both parties' motions, the three-judge panel decided to reserve its ruling on the question of Ms. Hunt's standing to challenge the Senate map.

- 15 -

explained that Senator Haile, in Sumner County, was part of "the urban core," while Senator Pody, in Wilson County, was "very disconnected from what life experiences are in [her] area." She said that the change from District 18 to District 17 took away her community's voice in the legislature because Senator Pody "is really not connected to the community in our area," and doesn't "represent [her] or [her] community's interest." She felt that, under the current districting plan, "there would be little chance to have somebody that has that kind of understanding for my area and for my life."

Ms. Hunt's trial testimony also focused on how the redistricting plan impacted her community's voice in the legislature. She reiterated at trial that Senator Pody was "very disconnected from the life experiences in [her] area." She also asserted that the new 3-1 staggered-term structure put Nashville at a disadvantage versus other populous counties by placing three districts up for election at a point in the election cycle with lower voter turnout. She described a county issue impacted by the change in her representation, namely, legislative efforts that she believed targeted Nashville, as "an overreach from the State into Nashville to even decide how we can govern ourselves." As an example, she cited "an effort to . . . take away [her] representative at the local level" by changing the number of metropolitan council districts in Nashville from 40 to 20. She believed the Nashville delegation could more effectively resist these efforts if the staggered-term structure of the delegation remained evenly split as constitutionally mandated.[26]

This proof in the record on Ms. Hunt's representational injury echoes Mr. Wygant's testimony on his representational injury. They both describe how the redistricting detrimentally affected the representation of their individual interests and the interests of their home counties.

In short, even under the majority's framework, Ms. Hunt demonstrates particularized injury for purposes of standing. She has sustained injury in the form of a 3-1 staggered-term representative structure for District 17 and Davidson County that is both immediate and imminent in the future. Her injury is neither conjectural nor hypothetical; it is certain to manifest again and again, each time turnover occurs in District 17 and Davidson County. Ms. Hunt perceived that her former senator could understand her urban area, and the redistricted map shortened the time Ms. Hunt was represented by her former senator. It placed her into a different senate district with a new senator whom she perceives as not connected to the community in her county. And Ms. Hunt has been placed into a senate district whose misnumbering renders it unconstitutional.

---

[26] *Cf. Lockert I*, 631 S.W.2d at 709 (citing the legislature's ability to pass laws with local application or effect as an "excellent policy reason for the presence of a provision that counties must be represented in the Senate").

By any measure, Ms. Hunt has standing to assert her district-specific claim. As with the Texas Supreme Court in *Abbott*, if Ms. Hunt "does not have standing to pursue" an Article II, Section 3 claim, I "struggle to envision a plaintiff who would." *Abbott*, 647 S.W.3d at 693.

I respect and share the majority's concern that courts be faithful to separation of powers and refrain from usurping authority that belongs to the legislative and executive branches. Tenn. Const. art. II, §§ 1–2. It is appropriate for the Court to require plaintiffs in public rights cases to show injury that is distinct and palpable. *Wilmington Tr.,* 703 S.W.3d at 290 (quoting *City of Memphis v. Hargett*, 414 S.W.3d 88, 98 (Tenn. 2013)).

But respect for constitutional boundaries does not mean we should recoil from our responsibilities. Where appropriate, we must not shrink from using the judicial power accorded to the Court under our Constitution. Tenn. Const. art. VI, § 1. It is essential to the constitutional order that each branch—and especially the judiciary—fulfill its role in our tripartite government.

Under our standing jurisprudence in redistricting cases, it should not be easier for the proverbial camel to go through the eye of a needle than for a voter to challenge the constitutionality of her own voting district.[27] Ms. Hunt has proper standing, and her claim should be considered on its merits.

s/HOLLY KIRBY, JUSTICE
HOLLY KIRBY, JUSTICE

---

[27] Matthew 19:24 (King James).

- 17 -